FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

APR 19 2011

JAMES W. McCORMACK, CLERK
By:_____
                    DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

CHERIE HOWARD AGEE                                              PLAINTIFF

v.                   CASE NO. 4:11-CV-339 GTE

ARKANSAS DEPARTMENT OF CORRECTIONS;                             DEFENDANTS
JEFFERY DEAN, in his Official Capacity and in his
individual capacity; CORRECTIONAL MEDICAL SERVICES;
DR. JASON GATES, O.D.; DR. DONALD ANDERSON, M.D.,
individually; MARY A. MATHEWS, individually; CHRISTOPHER
LOE, individually; JANET TIMER, individually; and
KATHERINE PETTIT, individually; et al.

This case assigned to District Judge Eisele
and to Magistrate Judge Young

## COMPLAINT

Comes now the Plaintiff, Cherie Howard Agee (Agee), by and through her attorney, the Morris W. Thompson Law Firm, P.A., and for her Complaint against the Defendants, states and alleges as follows:

### INTRODUCTION

This is an action to secure rights, privileges and immunities guaranteed by the Eighth and 14th Amendments to the United States Constitution brought under 42 U.S.C. § 1983 as well as 28 U.S.C. §§ 2201 and 2202. Plaintiff seeks redress against the Arkansas Department of Corrections (ADC), Jeffery Dean (Dean); Correctional Medical Services, Inc. (CMS) Dr. Jason Gates, (Gates), Dr. Donald Anderson, M.D. (Anderson), Mary A. Mathews (Mathews), Christopher Loe, (Loe), Katherine Pettit, (Pettit), and Janet Tiner, (Tiner). Dean is being sued individually and in his official capacity as final decision and policy maker for the ADC's McPherson Unit establishing policy,

1

procedure, and custom for inmate safety on the field squads. Said policies, practices and customs were deliberately indifferent to the inmates' rights to be free of cruel and unusual punishment protected by the 8th Amendment; and rights of property and liberty protected by the 14th Amendment amounting to a deprivation thereof.

Agee also brings suit against CMS for its policies and customs which caused and/or contributed the deprivation of Agee's rights to adequate and timely medical care, the deprivation of which amounts to cruel and unusual punishment in contravention of her rights and privileges secured and protected by the 8th and 14th Amendments and federal laws.

Agee also seeks relief in this court for the pendant state claim of violation of her rights protected by the Arkansas Civil Rights Act of 1993, Arkansas Code Annotated § 16-123-101 et seq.

Agee also seeks relief in this court for the pendant state tort claims of outrage and medical negligence. Defendants, CMS, Anderson, Tiner, Matthews, Pettit, Loe and Gates are sued individually for the pendant state tort claims of outrage and medical and nursing negligence.

## JURISDICTION

The jurisdiction of this Court is invoked pursuant to the authority of 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 1983 to redress violations of Agee's constitutional rights guaranteed by the 8th Amendment of the United States Constitution as applied by the 14th amendments to the State of Arkansas.

Additionally, pursuant to its plenary power this court has jurisdiction over the pendant state tort claims and the statutory civil rights claim.

## PARTIES

1. Plaintiff, Cherie Howard Agee (Agee), is a citizen of the United States and a resident of Little Rock, Pulaski County, Arkansas.

2

2. The Arkansas Department of Corrections (ADC), is a state agency vested with the authority and responsibility to operate state prisons. The agency has its headquarters in Pine Bluff, Arkansas. The McPherson Unit in Newport, AR serves both as the diagnostic and parent unit for women inmates.

3. Dean was, at all times pertinent, a Lieutenant at the McPherson Unit. Dean was the correctional officer over the field squad to which Agee was assigned and had supervisory and managerial discretion over the day to day operations thereof. At all pertinent times, Dean was responsible for the health, safety and welfare of the inmates assigned to the field squad under his supervision. As inmates, they are not able to make unilateral decisions on these matters and are forced to rely entirely upon the discretion and decisions of the correctional officers over them.

4. CMS, pursuant to a contract with the ADC is authorized to deliver comprehensive medical, dental, and mental health, and medication services for all incarcerated individuals housed and detained in ADC operated facilities, such as the McPherson Unit. Under the authority of that contract, CMS, a private corporation, carries out a traditional government function and thereby acts under color of state law. CMS' policies, customs, practices, rules, regulations, and standards violated Agee's Eighth Amendment right to be free from cruel and unusual punishment and her 14th Amendment rights to property and liberty. In addition thereto, CMS is being sued for medical negligence for failure to meet the acceptable standards of medical and nursing care.

5. Anderson, at all times relevant, was engaged by CMS to serve as the staff physician for the McPherson unit. In that regard, Anderson is a state actor and his actions are cloaked under the color of law. Anderson is sued for his refusal and delay in providing proper medical care for Agee's serious medical needs which amounts to deliberate indifference in violation of her rights; as well as for medical negligence for his failure to meet the applicable medical standard of care. Furthermore,

3

Agee's rights were so clearly established that Anderson is not entitled to qualified immunity.

6. Tiner, at all times relevant, is a Registered Nurse licensed to practice nursing by the State of Arkansas, and is an employee of CMS at the McPherson Unit. In that regard, Tiner is a state actor and her actions are cloaked under the color of law. Tiner is being sued for her refusal and delay in providing proper medical care for Agee's serious medical needs which amounts to deliberate indifference in violation of her rights; as well as for negligence for failure to meet the applicable standards of nursing care. Furthermore, Agee's rights were so clearly established that Tiner is not entitled to qualified immunity.

7. Mathews, at all times relevant, is a Registered Nurse licensed to practice nursing by the State of Arkansas, and is an employee of CMS at the McPherson Unit. In that regard, Mathews is a state actor and her actions are cloaked under the color of law. Mathews is being sued for her refusal and delay in providing proper medical care for Agee's serious medical needs which amounts to deliberate indifference in violation of her rights; as well as negligence for failure to meet the applicable standards of nursing care. Furthermore, Agee's rights were so clearly established that Mathews is not entitled to qualified immunity.

8. Loe, at all times relevant, is a Licensed Practical Nurse licensed to practice nursing by the State of Arkansas and is an employee of CMS at the McPherson Unit. In that regard, Loe is a state actor and his actions are cloaked under the color of law. Loe is being sued for his refusal to provide proper medical care for Agee's serious medical needs which amounts to deliberate indifference in violation of her rights; as well as for negligence for failure to meet the applicable standards of nursing care. Furthermore, Agee's rights were so clearly established that Loe is not entitled to qualified immunity.

9. Pettit at all times relevant, is a Licensed Practical Nurse licensed to practice

nursing by the State of Arkansas and is an employee of CMS at the McPherson Unit. In that regard, Petitt is a state actor and her actions are cloaked under the color of law. Pettit is being sued for her refusal to provide proper medical care for Agee's serious medical needs which amounts to deliberate indifference in violation of her rights; as well as for negligence for failure to meet the applicable standards of nursing care. Furthermore, Agee's rights were so clearly established that Petitt is not entitled to qualified immunity.

10. Gates, at all times relevant, held a doctorate in Optometry, licensed to practice Optometry by the State of Arkansas. Gates holds himself out to serve the public in the area of Optometry and is engaged in the practice of Optometry at Gates Eye Care Center, Inc., 200 North Harwood, in the City of Newport, Arkansas. Gates is sued for his refusal to provide proper medical care for Agee's serious medical needs which amounts to deliberate indifference in violation of her rights; as, well as for medical negligence for failure to meet the applicable optometric standard of care.

## FACTS

11. Agee was an inmate at the McPherson in October 2006. At that time, she was incarcerated under her maiden name, Howard. She has since married and her last name is now Agee.

12. On October 11, 2006, she was working her assigned duties on the field squad using the provided gardening implement, a hoe, to chop unwanted weeds and grasses.

13. The implement is designed to be grasped with both hands and swung forward to the ground with sufficient force to penetrate the ground and chop the growth off at or below he surface of the ground. Typically the user is bent forward at the waist and bent slightly at the knees such that the user's face is moving toward the ground as the implement strikes.

14. Frequently, the implement strikes harden ground, rocks and other hard material

causing fragments of rocks, metal or particles of earth, sand, etc. to fly up into the air forcefully striking the user's body and face.

15. Per the standard policy, practice and custom implemented by Dean, Agee was not provided goggles or other safety equipment to protect her from such incidents as described in paragraph 14 that commonly occur when work of this nature is being performed.

16. At approximately 9 am, Agee was using the implement as designed and described in paragraph 12 - 14 above. During the course of this work, as she struck the ground an object rebounded striking her right eye. The projectile hit with such force, it penetrated and was lodged in the interior of her eye.

17. Agee felt immediate pain and could not continue to work. She complained to Sgt. McLain that she had been hit in the eye by a projectile. McClain informed Deen and Deen gave her a bottle of water to wash out her eye. He took her off line but required her to pick grass by hand from the garden. Despite her continued pain, he required her to stay out with the squad until the normal time for her to return into the Unit, 11:00.

18. The pain and discomfort continued unabated and at 11:30, after the detail returned to the building, she allowed to go to the infirmary.

19. Initially, a CNA rinsed Agee's eye with a saline or dacriose solution. Agee was next examined by Mathews. The vision exam conducted by Mathews revealed that Agee's vision had deteriorated to 20/200. She was legally blind in the injured eye. Although the doctor was on site, Mathews did not refer her to the doctor, but only gave her Ibuprofen and instructed her to return to sick call in 24 hours for re-check.

20. Mathews, as a LPN, was not qualified by training to examine or diagnose a medical condition. She was acting outside of and above her training and qualifications. Additionally, CMS'

eye injury protocol defines the complaints and symptoms with which Ms. Agee presented as a medical emergency mandating that emergency procedures be implemented immediately. As an LPN, Mathews was required to consult the resident physician. She failed to follow the protocol. All of the foregoing was below the appropriate nursing standard of care.

21. Mathew's failure to timely and appropriately provide competent nursing care was due to CMS' and Anderson's failure to adequately train and supervise the nursing staff. This failure to train and supervise was a proximate cause of the loss of vision in Agee's eye and a proximate cause of the loss of the globe itself. The eye injury protocol evidences CMS' and Anderson's awareness of the dire consequences of a failure to timely and adequately treat eye injuries of this nature. In light of their knowledge of the irreversible and devastation results of an inadequate response, their failure to train and supervise evidences deliberate indifference to Agee's serious medical condition.

22. By 1300 hours, Agee's condition had deteriorated until she could no longer see clearly out the injured eye. She was seeing double and everything seemed to be seen through a veil of red. The pain was excruciating making her nauseated and causing her to throw up.

23. The pain progressively worsened and at approximately 1400 Agee begged the duty officer to be allowed to go to the infirmary. She was denied and told she would have to put in a sick slip. Agee, however, was in too much pain to see or think clearly. Other inmates in her area wrote out sick slips for her and gave them to the guards.

24. Upon information and belief, per his customary routine, at or around 1700 hours Anderson left the unit to go home. Per his custom, practice and habit, before his departure for the night, Anderson did not conduct an end of day briefing with the nursing staff nor review their charts to critique the care and treatment they provided inmates during the day that he had not seen. Had Anderson done so, he could have applied the eye injury protocol, detected the medical emergency

and rendered timely appropriate care. Anderson's failure, in this respect, to supervise the nursing staff to ensure the competent and timely administration of adequate medical and nursing care was below the applicable standard of medical care. Furthermore, this customary and routine practice of leaving the unit unaware of the inmate's medical status is deliberate indifference to their serious medical needs.

25. Finally, at approximately 1830, the guards in her pod called the infirmary demanding that Agee be seen. The LPN on duty, Loe, denied the request telling them Agee had been seen at 1140 and she was not scheduled for a follow-up until 24 hours had passed; that she would have to "drop a sick call like everybody else."

26. At approximately 1900, out of desperation and driven by pain, Agee rushed out of her pod into the hallway hollering and pleading for medical attention and relief from the pain. This was a desperate attempt to obtain medical attention. She knew that Unit protocol required the medical staff to accompany the correctional officers in responding to a disturbance of this type.

27. As she expected, the guards' emergency "responder call" brought nurses Loe and Pettit to the scene. They found Agee in the hallway visibly upset and crying. Instead of providing her the help she so desperately needed, Loe and Pettit refused to examine her and administer medical care. Petitt and Loe told Agee that as she had been seen earlier that day and was scheduled for follow-up in 24 hours, she would be seen only then.

28. Agee returned to her pod as directed. She was frightened that if she continued her protest and was thrown in 'the hole', administrative segregation, she would not be seen at sick call. To relieve her pain, Agee took all of the Ibuprofen she had been given earlier that day at once. The other inmates tended to her the best they could. Some who had Tylenol gave them to her in an attempt to relieve her pain.

29. CMS' eye injury protocol as understood and applied by Loe and Petitt amounted to a policy and practice which was deliberately indifferent to Agee's rights protected by the 14th and 8th Amendments and was a proximate cause of the loss of Agee's eye.

30. Furthermore, Loe and Petitt's failure to follow the eye injury protocol was below the appropriate standard of nursing care which was a proximate cause of the loss of Agee's eye.

31. The next morning, October 12, 2006, at approximately 0700, Agee awoke due to the unrelenting pain to discover the right side of her face was grotesquely misshapen from the swelling around her eye. The right side of her face was swollen and extremely painful. Her eye was swollen shut with purulent bloody drainage seeping out. The pus and blood seeping out had stuck the towel to the side of her face. She was in excruciating pain.

32. Again the medical staff refused to see her. However, at approximately 10:00 when Captain Faust arrived to conduct head count, she saw Agee's deformed and misshapen appearance and overrode medical, taking Agee immediately to the infirmary.

33. Some 25 hours or so after the injury, Anderson finally examined Agee. He merely instructed Tiner to administer 10mg Nubain and washed the eye with an irrigation solution. Significantly, he did not prescribe an aggressive antibiotic regimen to address the obvious infection. He failed to follow CMS' own eye injury protocol. Rather than treating her condition as an emergency as dictated by the protocol, he sought a consult with a local optometrist, Dr. Gates, who could not see her until 1300 hours that afternoon. A three hour wait is unacceptable in an eye emergency situation and Anderson should have located another provider who could tend her immediately. For the next three hours or more matters progressively worsened. The pain was unrelenting and her eye and her vision deteriorated.

34. Anderson's failure to treat the eye per the protocol and failure to diagnose the

9

penetrating injury to her eye was below the standard of medical care. At that time, Ms. Agee still had a chance to save her eye and most certainly the globe itself. Anderson's failure to timely prescribe and begin immediate antibiotic care, and order prompt diagnostic imaging examination destroyed Agee's prospects for achieving a more favorable outcome. It most certainly caused Ms. Agee to needlessly endure more pain and suffering. Anderson's care fell below the standards of medical care.

35. At approximately 1300 hours, the ADC transported Agee to Gates' office in Newport, Arkansas for examination and treatment. At this point, over 28 hours had lapsed post the injury. Gates misdiagnosed the problem, diagnosing it as hyphema with corneal abrasion and possible retinal tear. He prescribed eye drops and a follow-up with an ophthalmologist in a week. Despite the obvious infection, he did not prescribe anything to aggressively address the infection.

36. Additionally, despite Anderson's instructions, Gates failed to call to advise Anderson of his findings and recommendations. This and Gates's failure to diagnose the penetrating injury and embedded foreign body was below the standard of Optometric care.

37. By the time Agee was transport back to the Unit infirmary however, per his routine and custom, Anderson had left for the night without making proper arrangements for Gates to contact him regarding Agee's condition. The nursing staff only administered Ultram 50mg, 2 tid for the pain, but no antibiotic for the obvious infection. This too was below the applicable standard of medical and nursing care. As stated before, Anderson's departure from the unit without making suitable arrangements to be made aware of Gate's opinions and recommendations was the proximate result of his custom, routine and practice.

38. Agee was kept in the infirmary that night for observation. However, she was in extreme and excruciating pain the entire night to the extent she could not sleep. She cried and hollered from pain and threw up the entire night. Despite her life threatening condition, the nursing

10

staff did nothing to obviate her pain or bring the infection and fever under control. Their failure and refusal to provide the needed care was not only below the applicable nursing standard of care, but in deliberate indifference to her serious medical needs

39. The following morning, the Director of Nursing called Anderson regarding the progressive deterioration of Agee's condition. Anderson finally consulted Dr. McNair, a local ophthalmologist, who advised him to have Agee transported immediately to Harris Hospital ER for examination and treatment.

40. At Harris Hospital, a CT scan revealed a retained foreign body embedded in Agee's eye. Harris Hospital then arranged for Agee to be immediately transferred to UAMS in Little Rock.

41. At approximately 1900, Agee arrived at UAMS. Some 58 hours or so after the infection began Agee was finally administered a medical regimen to aggressively attack and treat the infection. By the time Agee arrived at UAMS, the infection had worsened to the point it was life threatening. There was the very real danger that the infection would spread not only throughout her circulatory system, but invade her brain as well. The infection had so compromised the structural integrity of the globe, that neither her vision nor the globe itself could be saved. The eye had to be surgically removed in order to save her life.

42. Agee was hospitalized at UAMS from October 13, 2006, until her release on or about October 20, 2006, to ADC's hospital facility in Pine Bluff, Arkansas.

43. Agee remained in Pine Bluff for approximately two (2) weeks, when upon her release she was returned to the McPherson Unit.

44. Due to the loss of her eye, Agee has suffered and continues to suffer bouts of extreme depression, loss of self esteem and confidence in her appearance as a young woman. Due to her depression, she has gained over 100 pounds since her release from incarceration.

11

45. As a result of the loss of her eye, Agee has suffered a loss of depth perception and visual functionality which adversely affects her daily living and employability, thus suffering a loss of earnings and earning capacity. Agee's damages are more fully enumerated below.

46. Agee remained at the McPherson Unit until January 4, 2007, when she was released from the ADC, having served her sentence.

47. ADC Administrative Directive 97-08 § IV(E) provides the steps that make the grievance procedures accessible to an aggrieved inmate. It provides only 15 days within which the inmate may grieve the offending conduct. Agee was in the hospitals, UAMS and the Diagnostic Unit, Little Rock, and Pine Bluff, away from her unit the entire 15 days.

48. Furthermore, as she was in the hospitals, still being treated, heavily sedated and medicated, she was mentally and physically incapable of proceeding with any grievance procedure during the 15 day window.

49. The grievance procedures provide no exceptions for circumstances such as these and consequently, denied Agee the ability to grieve the incident. As a result of this defect in the provisions, the procedures were not accessible to Agee up to and when the time period lapsed. As a result of the foregoing, she is excused from exhausting her administrative remedies.

50. Furthermore, at the time she brings this lawsuit, Agee is no longer a prisoner and the Prison Litigation Reform Act, (PLRA) 42 USCS § 1997e does not bar this action.

## FEDERAL CIVIL RIGHTS VIOLATIONS UNDER 42 U.S.C. SECTION 1983

51. Agee specifically incorporates and adopts by reference the allegations contained in paragraphs one 1 through 45 as if stated herein word for word.

52. Dean was over the field detail or hoe squad as it was called. He was delegated with final decision making authority regarding whether or not the inmates were provided protective eyewear. Dean was aware that propelled debris and particles frequently hit the inmates in the face and eyes while they worked in the fields. Dean made the decision that Agee and the other inmates were not to receive protective eyewear. Dean was aware that work of this nature posed a real and immediate risk to the inmates' vision, yet chose to deny the inmates the needed and necessary safety equipment. In that he was the final decision and policy matter on such matters, Dean's decision established policy, practice and custom for the McPherson Unit of the ADC. This policy of the ADC was in deliberate indifference to the safety, welfare and health of the inmates on the hoe squad.

53. Furthermore, Dean customary and routine response to inmate complaints of debris, sand, dirt and other particles in their eye was simply provide them water to wash out their eyes. His decisions in that regard established the policy, practice and custom for the ADC.

54. Dean was also responsible for the decision not to immediately return Agee to the infirmary but keep her out on the grounds working for no less than 2 additional hours. This act was consistent with Dean's customary way of handling these frequent occurrences. This practice was the typical way in while assaults to the inmates' eyes that it was the pervasive and customary way of doing things on the field details. Dean is being sued in both his individual and official capacity.

55. The aforementioned decisions were in deliberate indifference to Agee's serious medical needs. Said decisions and actions resulted in Agee enduring unnecessary and needless pain and suffering and mental amounting to cruel and unusual punishment. With respect to Dean's individual capacity, these rights were so well established in October 2006, that Dean is not entitled to qualified immunity.

56. As stated previously, Dean's decisions as the final decision and policy maker with

respect to the safety and welfare of the inmates under his supervision on the field squad set policy for the ADC. The ADC, as a governmental agency, is not entitled to the protection of qualified immunity. The policies and procedures established by Dean as set forth in the preceding paragraphs were in deliberate indifference to Agee's constitutional rights. These policies were a proximate cause of the deprivation of Agee's rights. For such customs, policies and procedures which resulted in deliberate indifference to and the deprivation of Agee's rights and injury, she seeks damages as set forth herein below.

57. The above recited acts and omissions of the CMS defendants while acting under color of their authority constitute deprivations of Agee's constitutional rights as guaranteed by the 8th and 14th Amendments to the United States Constitution. Such acts of defendants while acting within the color of their authority are sufficient to invoke an action under 42 U.S.C. § 1983 against them for which Agee seeks damages as set forth below.

58. The acts, customs and policies as implemented and applied by CMS were deliberately indifferent to Agee's rights and privileges secured by the Arkansas Constitution, the Amendments thereto and the Arkansas Civil Rights Act.

59. CMS's actions resulting in the violation of Agee's rights were done in deliberate indifference to her rights protected by the protected by the Arkansas and U.S. Constitution. These actions, among other things, were the result of CMS' policies, rules, regulations, practices, and customs which resulted in an abdication of its duty to:

a) train and/or supervise its employees responsible to respond to and provide care for medical needs of those over whose medical care of which they had charge.

b) provide adequate staff supervision;

c) identify inadequate staff performance;

14

d)  provide appropriate assessment, diagnosis, and interventions through its staff;

e)  prevent harm and/or loss of Agee's eye due to a retained foreign object, acute corneal ulceration and infection;

f)  adhere to applicable standards and regulations by not providing adequate medical facilities, treatment, personnel and/or referral;

g)  to train nurses and staff with the proper policies, protocols and procedures for caring for Agee and persons with severe eye injuries;

h)  otherwise adopt and/or follow policies and procedures with could have been reasonably expected to insure proper care and treatment.

## VIOLATION OF THE ARKANSAS CIVIL RIGHTS ACT (ACRA), A.C.A. § 16-123-101 ET SEQ.

60.  Agee specifically incorporates and adopts by reference the allegations contained in paragraphs one 1 through 45 as if stated herein word for word.

61.  The actions complained described above were in deliberate indifference to Agee's well known and established rights protected by the Arkansas Constitution and state laws to specifically include the Arkansas Civil Rights Act. Such acts of defendants are sufficient to invoke an action under A.C.A. § 16-123-101 et seq. against them for which Agee seeks damages as set forth below. As the result thereof she is entitled to both compensatory and punitive damages. As a result of the specified conduct, Agee is entitled to an award of costs to include attorney's fees.

## MEDICAL NEGLIGENCE

62.  Agee specifically incorporates and adopts by reference the allegations contained in paragraphs one 1 through 45 as if stated herein word for word.

63.  To the extent that CMS and any medical and/or nursing care provider is found to have acted under color of state law and thus are state actors, they are not entitled to sovereign immunity

15

pursuant to the Arkansas State Constitution to the extent they carry liability insurance.

64. The medical, nursing, and Optometric defendants failed to possess and/or apply the degree of skill and learning ordinarily possessed and used by members of their profession in good standing, engaged in the same type of service or specialty in the location they practiced, or a similar location, while rendering said service to Agee on or about October 11, 2006 up to and through October 13, 2006.

65. In addition to all other acts of negligence and or fault alleged herein, Anderson and Gates jointly and severally are liable in the following particulars:

a) In failing to properly diagnose, treat and manage Agee's sight and life threatening condition;

b) In failing to take the proper steps in determining the true and accurate nature of Agee's condition;

c) In failing to use the pertinent skills and knowledge expected of physicians, nurses, hospitals, medical facilities, and other healthcare and optometric personnel under like circumstances;

d) In failing to properly attend, inspect, evaluate, and treat Agee;

e) In failing to use reasonable care under the existing circumstances for Agee's attendant examination, evaluation, and treatment;

f) In failing to use diligence to ascertain all available facts and reports and collect data essential for the proper diagnosis and treatment; and,

g) In otherwise failing to act as a reasonable, prudent, and competent physician, nurse, hospital, Optometric, and other healthcare personnel under like or similar circumstances in Jackson County, Arkansas or in similar localities.

h) Failed to refer Agee to the appropriate level of care and obtain consultation with appropriate specialist(s) in ophthalmology.

i) Failed to recognize, diagnose and treat an acute corneal ulceration and vision threatening condition requiring specialty intervention by an Ophthalmologist.

j) Failed to properly examine Agee and to maintain an accurate record of

examinations, diagnosis and treatment and attempted to conceal these failures by altering the record at a later time.

k) Failed to follow established standards of practice, guidelines, and policies and procedures in the examination, evaluation and treatment of Agee.

l) Failing to have Agee admitted on October 12, 2006, for further observation and radiographic examination in consideration of her clinical presentation.

m) Failed to properly diagnose the symptoms for a retained foreign body in her right eye.

66. Tiner, Loe, Johnson, Mathews, and Pettit were negligent in the following particulars, among other things:

a) Failed to notify the physician of recurrent and severe pain in a timely manner;

b) Failed to notify physician of changes in condition;

c) Failed to notify nurses of the next level of responsibility when changes in condition were observed;

d) Failed to appropriately apply the nursing process through assessment, diagnosis, planning, interventions and evaluation to reduce risk, prevent harm and promote health;

e) Failed to adequately assess and investigate the cause of Agee's pain and other symptoms;

f) Failed to identify and provide appropriate interventions when changes in condition warranted;

g) Failed to follow established standards of practice, guidelines, protocols and policies and procedures in the examination, evaluation and treatment of Agee.

h) Fail to apply and follow CMS' eye injury protocol.

## OUTRAGE

67. Agee specifically incorporates and adopts by reference the allegations contained in paragraphs one 1 through 45 as if stated herein word for word.

68. In addition to Anderson's refusal and failure to come to the infirmary to examine

17

Agee, and maintain an accurate record of examinations, diagnosis and treatment, Anderson and thereby CMS attempted to conceal these failures by altering the record at a later time.

69. The intentional and unnecessary acts and omissions complained of herein constitute the tort of outrage pursuant to Arkansas law, in that the acts were willful, wanton and committed with reckless disregard of the natural and foreseeable consequences of such acts. Such conduct was extreme and outrageous to such a degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized society. As a natural and foreseeable result of said acts of defendants, Agee has suffered severe emotional distress.

## DAMAGES

70. For the acts, omissions, customs, practices and policies complained of herein, Agee seeks the following relief:

    a. Damages for violation of her constitutionally and federally protected rights;

    b. Damages for the intentional acts of outrage;

    c. Damages for emotional distress, past and future;

    d. Damages for pain, suffering, past and future;

    e. For permanent physical injury, past and future;

    f. Damages for loss wages and loss of earning capacities, past and future;

    g. Damages for the loss of her eye;

    h. Damages for permanent scarring and disfigurement;

    i. Past and future medical and medically related expenses;

    j. Damages for medical negligence;

    k. Punitive damages; and

    l.    Reasonable attorney's fees and costs.

71.    Agee reserves the right to amend and plead further as facts are revealed upon discovery.

WHEREFORE, Plaintiff, Cherie Agee, requests a judgment against Defendants, jointly and severally, for violation of her rights protected by the United States and Arkansas Constitutions; and for the pendant state tort claims, to wit: violation of the Arkansas Civil Rights Act, outrage, and medical negligence; for punitive damages; for reasonable attorney's fees and costs; and for all other just and proper relief to which she may be entitled.

PLAINTIFF DEMANDS A JURY TRIAL.

Respectfully submitted for
Cherie Agee, plaintiff herein

Morris W. Thompson Law Firm, P.A.
P. O. Box 662
Little Rock, AR  72203
(501) 661-8100
(501) 372-4101
mwthompsonlaw@sbcglobal.net
ABN#80145